**UNITED STATES of America, Plaintiff–Appellee–Cross–Appellant,**

v.

**Joe GARZA–JUAREZ and Esteban Garza–Juarez, Defendants–Appellants–Cross–Appellees.**

Nos. 92–10187, 92–10188, 92–10233 and 92–10234.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 12, 1993.

Decided April 23, 1993.

Gregory R. Jordan, Phoenix, AZ, for defendant-appellant-cross-appellee Esteban Garza–Juarez.

David M. Ochoa, Phoenix, AZ, for defendant-appellant-cross-appellee Joe Garza–Juarez.

Timothy Holtzen, Asst. U.S. Atty., Phoenix, AZ, for plaintiff-appellee-cross-appellant.

Before: ALDISERT *, GOODWIN and FLETCHER, Circuit Judges.

ALDISERT, Circuit Judge:

We are presented with cross appeals. Appellants Joe Juarez and Esteban Juarez, who were convicted on charges stemming from the sale of firearms and the possession of unregistered suppressors (silencers), present questions of entrapment and improper and vindictive prosecutorial conduct. The gov-

ernment appeals from the district court's downward departure from the sentencing guidelines recommendations, the sentencing court being of the view that the government's investigatory conduct was sufficiently coercive to warrant a mitigation of the sentences. We affirm the convictions and sentences in all respects.

Jurisdiction was proper in the trial court based on 18 U.S.C. § 3231. This court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(b) (appeals from sentencing). The appeals were timely filed under Rule 4(b) of the Federal Rules of Appellate Procedure.

I.

The investigating agents initiated numerous meetings and telephone conversations with the Juarez brothers, and one agent wore a hidden microphone during all of the meetings and also taped all telephone conversations. Trial trans., Nov. 12–14, 1991, at 79. The tapes of four conversations, on June 9, August 4, August 14 and August 15, were played for the jury; transcripts of the conversations on June 9, August 4 and August 15 were introduced as exhibits. Tapes or transcripts of the other conversations were not introduced. These conversations were described by testimony at trial. The defendants did not testify.

A.

In February 1990, Border Patrol Agent Everly informed Agent Murillo of the Bureau of Alcohol, Tobacco and Firearms that firearms were being sold at a swap meet east of Casa Grande, Arizona and that firearms were being sold to illegal aliens at swap meets in the area. The government also interviewed a minor who was arrested while in possession of a MAC–11 assault-type firearm; he said he bought it from a Hispanic male at the Casa Grande swap meet. Govt. Br. at 5–6. The government had no information linking Joe Juarez to illegal acts, and a background

---

* Ruggero J. Aldisert, Senior Judge, United States Court of Appeals for the Third Circuit, sitting by designation.

check of Joe Juarez revealed that he had no criminal record.

On June 9, 1990, Agent Murillo and Agent Serrano went to the Casa Grande swap meet, where they saw Joe Juarez with 10 to 15 firearms, including assault weapons, displayed for sale. The agents initiated a conversation. Joe Juarez stated that he was selling his personal gun collection because he was unemployed and needed money. Agent Murillo "concluded that there were many factors showing that Joe Juarez was selling other than a personal collection": The guns were in a glass display case of the type used in stores; many of the guns were new and some were still in boxes; and Joe Juarez showed Murillo a photograph of approximately 25 more weapons that he said were also in his collection. Govt. Br. at 6.

The June 9 conversation can be summarized as follows:

- Joe Juarez told Murillo that Murillo could own a fully automatic weapon or a "suppressor" (silencer) but that he should get it by December, because thereafter these items could not be purchased legally. Govt's E.R., Ex. A, at 3.
- Murillo asked Joe Juarez if the displayed weapons could be converted to full automatic. Joe replied that he could take them to someone who would do it and who might charge about $50. He then stated that kits could be purchased legally to convert the weapons to full automatic. When the agent asked a second time if Joe could convert the weapons, Joe demurred, saying that if he were caught with an unregistered automatic weapon, he would go to jail and lose everything. *Id.* at 5–8, 9.
- Murillo asked if he could get a suppressor. Joe responded that Murillo would have to fill out paperwork, or that he could make his own suppressor. The agent said he "[didn't] want to deal with it," and Joe informed him that suppressors "go by the serial numbers" and "it's a real touchy situation." *Id.* at 6–7.
- Murillo said he was shopping for a friend who did not want to fill out any paperwork. Joe replied that he (Joe) could sell guns without any paperwork, be-

cause the guns were in his personal collection, and he was not a dealer. *Id.* at 4, 10, 14.

- Murillo said he was from Tucson and asked Joe for his name and phone number so he could get back in touch with him. Joe at first refused, saying "Don't they have swap meets in Tucson?" but then gave Murillo his name and phone number. *Id.* at 10–11.

On June 19, 1990, Murillo called Joe Juarez at home and again talked about purchasing firearms. In this conversation, Murillo said the friend he was shopping for had "done time" and thus did not want to fill out any paperwork. Joe replied that the guns were his, and he was selling them because he needed the money. They agreed to meet.

On June 28, 1990, Murillo met Joe Juarez at a Circle K store in or near Casa Grande. Murillo was accompanied by Earl Morris, a convicted felon. Morris told Joe Juarez that he was a felon and was not allowed to have guns. According to the government, Joe said that if the weapon was traced back to him, he would deny knowing who bought it. Joe sold Morris a 9 mm. MAC–11 semiautomatic firearm. Joe also took Murillo and Morris to a van parked nearby, where they were introduced to Esteban Juarez. Esteban showed them several guns he had for sale, but no further purchases were made.

On July 5, 1990, Murillo called Joe Juarez and said he wanted to buy some guns for a friend. Joe expressed concern about selling any guns, because he had heard that some federal agents were in town. Murillo called again on July 18, 1990, and asked about guns for his friend. Joe Juarez said he had nothing to sell except some old rifles.

On August 4, 1990, Murillo and Morris went to the Casa Grande swap meet and approached Joe Juarez. They asked about buying handguns, and Joe then sold four handguns to Morris. Esteban Juarez was standing nearby, and he and Murillo discussed suppressors. Murillo noticed that Esteban was holding a barrel extension, and he asked if Esteban could rig up a suppressor. Esteban answered that he could, that it would cost about $200, and that if Murillo were caught he could unscrew the suppressor

and dump out the contents. Murillo asked if Esteban could make a MAC–11 fully automatic and fit it with a suppressor. Esteban said he could for "about five" plus the cost of the gun.

On August 14, 1990, Murillo called Joe Juarez and asked about buying a fully automatic weapon with a suppressor. After some apparent prodding from Murillo, Joe agreed to sell a MAC–11 and a barrel extension.

Murillo called again on August 15, 1990, and asked about the gun. Joe described problems encountered with weapons converted to full automatic and said that he didn't like to do the conversions for this reason. He reminded Murillo several times that "you guys can do it," but Murillo again said he didn't know how. Joe Juarez eventually agreed to supply a MAC–11 and a barrel extension for $300 and said he thought his partner (identified as "Eric" but actually Esteban) could do the conversion and make the suppressor for an additional $300, bringing the total to $600.

Murillo called again on August 24, 1990, and confirmed the purchase of the automatic weapon with suppressor.

On September 1, 1990, Murillo and Agent Serrano went to the swap meet, where they found Joe and his brother Esteban Juarez. Murillo asked about purchasing two automatic weapons with suppressors. Esteban said he could have them ready in a couple of days and said the price would be $1,400 for both.

On September 5, 1990, Murillo called Joe Juarez and arranged to meet him at a K–Mart parking lot. Once there, he asked about the automatic weapons with suppressors, and Joe said they were having problems and were still working on them.

The final contact took place on September 12, 1990. Murillo and Serrano met Joe Juarez at the K–Mart parking lot. Joe led them to another location, where they met Esteban Juarez. Esteban said he did not have the weapons ready but that he had suppressors. When the agents were shown the suppressors in Esteban's truck, Joe and Esteban were arrested. The agents found twelve weapons in Joe Juarez' truck.

**B.**

On October 10, 1990, the grand jury returned a seven-count indictment charging the Juarez brothers with identical offenses related to the three suppressors seized at the time of the arrest. The indictment charged them with one count of conspiracy to possess unregistered firearms (silencers), in violation of 26 U.S.C. §§ 5861(d), (i) and 18 U.S.C. § 371 (count 1); three counts of possession of unregistered firearms (silencers), in violation of 26 U.S.C. § 5861(d) and 18 U.S.C. § 2 (aiding and abetting) (counts 2–4); and three counts of possession of firearms (silencers) not identified by serial numbers, in violation of 26 U.S.C. § 5861(i) and 18 U.S.C. § 2 (counts 5–7).

A ten-count superseding indictment was returned on April 24, 1991. The same seven counts were included (renumbered 4 through 10), and three new counts were added against Joe Juarez: dealing in firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A) and § 924(a)(1)(D); selling a gun to a convicted felon on June 28, 1990, in violation of 18 U.S.C. § 922(d) and § 924(a)(2); and selling four guns to a convicted felon on August 4, 1990, in violation of 18 U.S.C. § 922(d) and § 924(a)(2).

The first indictment was based on a report given to Joe Juarez' counsel on October 9, 1990. A further report disclosed to defense counsel on November 26, 1990, described the additional violations forming the basis for the additional three counts contained in the superseding indictment.

A plea bargain was offered, according to the government's brief:

> In addition to one or more brief conversations concerning plea negotiations, the government advised [Joe Juarez' counsel] by letter of December 19, 1990, that:
>
>> You may wish to consider that your client and his brother will have to plead guilty very quickly or I will consider filing additional charges against your client for the matters contained in the supplemental reports that I gave you.

Govt. Br. at 24. Neither Joe nor Esteban pled guilty to the charges.

On February 13, 1991, and February 25, 1991, the defendants filed motions to dismiss the indictment for outrageous government conduct during the investigation. The government filed its response on March 1, 1991, and then sent both defendants a letter on March 11 detailing a "package deal": The government would not file any additional charges based on the sale of firearms to a convicted felon if the defendants pleaded guilty to the charges in the initial indictment. The offer set a March 15 deadline for acceptance. Joe Juarez also asserts that government counsel, Timothy Holtzen, told Joe's counsel that the package deal would be withdrawn if Joe proceeded with his motion to dismiss for outrageous misconduct. The government does not dispute this assertion.

The defendants rejected the plea offer. At a March 18, 1991, hearing on the motion to dismiss, the district court denied the motion. The superseding 10–count indictment was returned April 24.

On May 1, 1991, counsel for Joe Juarez moved the court to dismiss the superseding indictment as based on prosecutorial vindictiveness. A hearing on the motion was held on May 20, 1991. The court denied the motion by order dated May 22, 1991. The order did not set forth the grounds for the court's decision. A jury trial of both defendants commenced on November 12, 1991.

### C.

At the close of the government's case, the defendants moved for judgment of acquittal based on entrapment as a matter of law. The court denied the motion. The motion was renewed at the close of all evidence and again denied.

The jury charge did not include a definition of "possession." During jury deliberations, the foreman sent the judge a note: "What is the legal definition of possess and possession as used in Count 5?" Before the court could answer, the jury reached a verdict.

Joe Juarez was found guilty on counts 1 through 3 (dealing guns without a license and selling guns to a convicted felon) and 5 through 10 (relating to possession of silencers). Esteban Juarez was found guilty on counts 5 through 10. Both defendants were acquitted on count 4 (conspiracy). The defendants moved under Rule 29(c), Fed. R.Crim.P., for judgment of acquittal based on entrapment and on the insufficiency of the evidence to support a finding of predisposition to commit the crimes charged. The court denied this motion.

On February 6, 1992, the district court notified the parties of its intent to depart downward. Each defendant had a base offense level of 14, Criminal History Category of I. The sentencing guidelines called for a term of 15–21 months imprisonment.

The court stated that a downward departure was appropriate in Joe Juarez' case because of his medical condition: "The defendant suffers from a medical condition, panic disorder with agoraphobia, which is a mitigating factor of a kind not adequately taken into consideration by the sentencing commission in formulating its guidelines." C.R. 86, at 2 (citing U.S.S.G. § 5H1.3 and § 5K2.0, 18 U.S.C. § 3553(b)).

The court also stated that a downward departure was appropriate in both defendants' cases, because "the conduct of this investigation, although not amounting to entrapment, was sufficiently coercive in nature as to warrant a downward departure under Guideline 5K2.12." *Id.*

On March 3, 1992, the court sentenced the defendants to six months house arrest, sixty months probation and 100 hours of community service on each count, the sentences to run concurrently. The defendants were also prohibited from possessing firearms and were required to submit to whatever counseling programs their probation officer deemed appropriate.

### II.

The issues raised in these cross appeals may be summarized:

### A.

The Juarez brothers raise a number of contentions, which can be condensed into four principal arguments.

■ First, they argue that the government's investigatory actions constituted outrageous conduct and that the district court erred in refusing to dismiss the indictments on due process grounds or in the exercise of its supervisory powers. The district court's decision on the due process claims raises questions of law subject to de novo review, *United States v. Smith,* 924 F.2d 889, 897 (9th Cir.1991), while the court's refusal to exercise its supervisory powers is reviewed for abuse of discretion. *United States v. Barrera–Moreno,* 951 F.2d 1089, 1091 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992).

■ Second, Joe Juarez argues that the superseding indictment containing additional charges against him was motivated by prosecutorial vindictiveness, and the district court erred in denying his pretrial motion for dismissal. The standard of review governing this contention is unsettled. *Compare Guam v. Fegurgur,* 800 F.2d 1470, 1472 (9th Cir. 1986) (citing *United States v. Gann,* 732 F.2d 714, 724 (9th Cir.) (abuse of discretion or clearly erroneous), *cert. denied,* 469 U.S. 1034, 105 S.Ct. 505, 83 L.Ed.2d 397 (1984)), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987), *with United States v. Martinez,* 785 F.2d 663, 666 (9th Cir.1986) (de novo).

■ Third, the brothers argue that the evidence proves entrapment as a matter of law and was insufficient to prove predisposition to commit the crimes charged, and therefore the district court erred in denying the motions for judgment of acquittal. In considering these contentions, we must review the evidence in the light most favorable to the government and decide whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Citro,* 842 F.2d 1149, 1151 (9th Cir.), *cert. denied,* 488 U.S. 866, 109 S.Ct. 170, 102 L.Ed.2d 140 (1988).

■■ Fourth, the brothers argue for the first time on appeal that the district court erred in failing to define possession in the jury charge. Jury instructions are not erroneous if, considered as a whole, they fairly and adequately state the applicable law.

*Oviatt ex rel. Waugh v. Pearce,* 954 F.2d 1470, 1480 (9th Cir.1992). Because this contention was not presented in the district court, we may not reverse absent plain error, that is, a highly prejudicial error affecting substantial rights. *United States v. Hernandez,* 876 F.2d 774, 777 (9th Cir.), *cert. denied,* 493 U.S. 863, 110 S.Ct. 179, 107 L.Ed.2d 135 (1989).

### B.

The government raises three challenges to the sentences. It argues that the district court erred in applying U.S.S.G. § 5K2.12 (policy statement) to depart downward based on coercion or duress; the court erred in applying section 5H1.3, p.s. to depart downward based on Joe Juarez' medical condition; and the court erred in departing downward without reasons based on the structure and policies of the sentencing guidelines.

■ Downward departures are reviewed under 18 U.S.C. § 3742(f) and under the three-part test of *United States v. Lira–Barraza,* 941 F.2d 745, 746–47 (9th Cir.1991) (en banc). The sentence will be affirmed if: (1) the district court had authority to depart; (2) factual findings were not clearly erroneous; and (3) the extent of the departure was reasonable in light of the structure, standards and policies of the statute and guidelines.

### III.

Joe and Esteban Juarez argue that the government committed outrageous conduct by targeting them even though the government had no evidence that either was engaged in criminal activity. Esteban Juarez argues also that the government's actions after the first contact constituted outrageous conduct.

■ Outrageous government conduct refers to behavior of investigators. This conduct is considered without reference to any predisposition on the defendant's part. *United States v. Luttrell,* 889 F.2d 806, 811 (9th Cir.1989), *amended,* 923 F.2d 764 (9th Cir.1991) (en banc), *cert. denied sub nom. Kegley v. United States,* —— U.S. ——, 112

S.Ct. 1558, 118 L.Ed.2d 207 (1992). The government's conduct may warrant a dismissal of the indictment if that conduct is so excessive, flagrant, scandalous, intolerable and offensive as to violate due process; the trial court may also dismiss the indictment in the exercise of general supervisory powers. *Luttrell,* 889 F.2d at 811. We will first consider whether the government's conduct violated due process.

### A.

■ "Prosecution is barred [for violation of due process] 'only when the government's conduct is so grossly shocking and so outrageous as to violate the universal sense of justice.'" *United States v. Ramirez,* 710 F.2d 535, 539 (9th Cir.1983) (quoting *United States v. Ryan,* 548 F.2d 782, 789 (9th Cir. 1976), *cert. denied,* 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977)). This has been described as "an extremely high standard." *United States v. Smith,* 924 F.2d 889, 897 (9th Cir.1991).

This court has stated that outrageous conduct may also be found when the government "operate[s], for an extended period of time, an actual and illegal apparatus." *Luttrell,* 889 F.2d at 812 (citing *Greene v. United States,* 454 F.2d 783, 786–87 (9th Cir.1971) (government established illegal bootlegging operation, provided substantial equipment and supplies, ran it for two-and-a-half years and was its sole customer)). *See also United States v. Citro,* 842 F.2d 1149, 1152–53 (9th Cir.1988) ("This defense ... may be applied where involvement by undercover police officers or informers in contraband offenses is so extensive that due process prevents the conviction of even a predisposed defendant.")

Joe Juarez argues that the government's outrageous conduct consisted of targeting him for an investigation without any reason to suspect he was engaged in illegal conduct. He relies on the panel opinion in *Luttrell* and also provides an extensive catalogue of facts supporting this contention.

Joe Juarez' reliance on the panel opinion in *Luttrell* is untenable. The portions of *Luttrell* that he quotes were later deleted by the court en banc. 923 F.2d at 764. The court stated, "In partially vacating the three-judge

court's opinion, we follow four of our sister circuits in explicitly rejecting a 'reasoned grounds' requirement for investigation of an individual under the due process clause." *Id.* (citing cases). Therefore, any inability to state reasons for investigating Joe Juarez does not represent a constitutional violation.

■ Nor was the government's conduct "grossly shocking and ... outrageous." *See, e.g., United States v. Emmert,* 829 F.2d 805, 811–12 (9th Cir.1987) (confidential informant's offer of $200,000 "finder's fee" to college student in return for supplying cocaine did not constitute outrageous conduct); *United States v. Simpson,* 813 F.2d 1462, 1466 (9th Cir.) (FBI's continued use of woman informant who became sexually involved with defendant did not constitute outrageous conduct), *cert. denied,* 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987).

■ Esteban Juarez argues that the same considerations which require a finding of entrapment as a matter of law also constitute outrageous government conduct. To the extent that this argument relies on the government's lack of a reasoned ground for investigating Esteban Juarez, it must fail under the teachings of our en banc opinion in *Luttrell.* His focus on the government's alleged efforts to implant a criminal intent is relevant to entrapment but not to outrageous conduct, which does not take account of the defendant's predisposition. *Luttrell,* 889 F.2d at 811.

He raises for the first time in his reply brief the argument that the government's activities after the first contact constituted outrageous conduct in violation of due process. In *Smith,* we held that the government's use of an undercover agent to encourage an 18–year–old patient in a drug-treatment center to deal illegal drugs was not outrageous government conduct sufficient to violate due process. 924 F.2d at 897. The court also noted that outrageous conduct had not been found in cases where the government agents supplied the contraband, committed equally serious offenses or assisted and encouraged prison escapes. *Id.* (citing cases).

Agent Murillo did take the lead· during most of the investigation; he initiated all contacts, raised the subject of illegal firearms and offered to supply the materials. However, these actions do not satisfy the extremely high standard that Esteban Juarez must meet under *Smith.* His due process argument must be rejected.

### B.

■ A district court may exercise its supervisory powers to dismiss an indictment to remedy the violation of recognized rights, to deter illegal conduct and "to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury." *United States v. Hasting,* 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983). This court has further explained that judicial integrity is rarely, if ever, threatened by conduct outside of the courtroom, and that "[c]ourts do not have the authority to supervise out-of-court executive procedure in the absence of a constitutional or statutory violation." *United States v. Barrera–Moreno,* 951 F.2d 1089, 1092 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992).

■ Joe Juarez argues that the same facts representing the due process violation also warranted an exercise of the district court's supervisory powers to dismiss the indictment. Given that the government's targeting of Joe Juarez did not violate his constitutional rights and was not illegal, the only basis for relief would be to protect judicial integrity by ensuring that the jury considered only valid matters in arriving at a conviction. *Hasting,* 461 U.S. at 505, 103 S.Ct. at 1978. There is no indication that the jury considered any inappropriate matters. The district court did not abuse its discretion in declining to exercise its supervisory powers with regard to Joe Juarez.

■ Esteban Juarez incorporates by reference his due process contentions, arguing that the government "exceed[ed] the bounds of permissible investigatory conduct" by coaxing him to supply illegal firearms and offering to supply the gun and barrel extension.

We rejected a similar argument in *United States v. Ramirez,* 710 F.2d 535, 539, 541 (9th Cir.1983) (exercise of supervisory power to dismiss indictment was not warranted when police enlisted informant, played active role in criminal enterprise and then prosecuted defendant for his related criminal actions that were outside scope of his work as informant). This court found that none of the purposes identified in *Hasting* would be advanced by a dismissal. *Id.* at 541.

The contentions here must be rejected as well.

### IV.

■ Joe Juarez argues that the superseding indictment was the product of prosecutorial vindictiveness. To rule on this question, we must examine the events between the first indictment on October 10, 1990, and the superseding indictment on April 24, 1991.

After· the first indictment was returned, the government offered Joe and Esteban Juarez a package deal, requiring them to plead guilty to the charges in the indictment, in return for which no additional charges would be brought. Government counsel also told Joe Juarez' counsel that the deal would be withdrawn if Joe proceeded with his motion to dismiss the indictment for outrageous conduct. The package deal was rejected, Joe pressed his motion, and the government thereafter sought and obtained the superseding indictment. Joe Juarez argues that the second indictment was motivated by prosecutorial vindictiveness.

The Supreme Court has held that the Due Process Clause prohibits the prosecution of more serious charges or the imposition of a harsher sentence against a defendant merely because the defendant has exercised his right to appeal from a conviction. *Blackledge v. Perry,* 417 U.S. 21, 28–29, 94 S.Ct. 2098, 2102–03, 40 L.Ed.2d 628 (1974); *North Carolina v. Pearce,* 395 U.S. 711, 723–24, 89 S.Ct. 2072, 2079–80, 23 L.Ed.2d 656 (1969). The Court stated· that due process concerns are raised only in circumstances presenting a "realistic likelihood of 'vindictiveness.'" *Blackledge,* 417 U.S. at 27, 94 S.Ct. at 2102.

The Court applied this prohibition to the pre-trial context in *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). The defendant in that case rejected a plea bargain, and the Court held that the government's obtaining a superseding indictment containing additional charges did not violate due process. However, the Court recognized that "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *Id.* at 363, 98 S.Ct. at 668.

Evidence indicating a realistic or reasonable likelihood of vindictiveness may give rise to a presumption of vindictiveness on the government's part. *United States v. Goodwin*, 457 U.S. 368, 373, 102 S.Ct. 2485, 2488, 73 L.Ed.2d 74 (1982). We have stated that "to establish a claim of vindictive prosecution the defendant must make an initial showing that charges of increased severity were filed because the accused exercised a statutory, procedural, or constitutional right in circumstances that give rise to an appearance of vindictiveness." *United States v. Gallegos–Curiel*, 681 F.2d 1164, 1168 (9th Cir.1982).

The Supreme Court has emphasized, however, that this presumption must be supported:

> There is good reason to be cautious before adopting an inflexible presumption of prosecutorial vindictiveness in a pretrial setting. In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance. At this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized....
>
> In addition, a defendant before trial is expected to invoke procedural rights that inevitably impose some "burden" on the prosecutor. Defense counsel routinely file pretrial motions to suppress evidence; to challenge the sufficiency and form of an indictment; to plead an affirmative defense; to request psychiatric services; to obtain access to government files; to be tried by jury. It is unrealistic to assume

that a prosecutor's probable response to such motions is to seek to penalize and deter.

*Goodwin*, 457 U.S. at 381, 102 S.Ct. at 2492–93. Adequate consideration must be given to " 'the give-and-take negotiation common in plea bargaining between the prosecutor and defense.' " *Bordenkircher*, 434 U.S. at 362, 98 S.Ct. at 667 (quoting *Parker v. North Carolina*, 397 U.S. 790, 809, 90 S.Ct. 1474, 1479–80, 25 L.Ed.2d 785 (1970) (Brennan, J., concurring in part and dissenting in part)).

Once a presumption of vindictiveness has arisen, "the burden shifts to the prosecution to show that any increase in the severity of the charges did not stem from a vindictive motive, or was justified by independent reasons or intervening circumstances that dispel the appearance of vindictiveness." *Gallegos–Curiel*, 681 F.2d at 1168.

In the present case, the package deal provided that more serious charges could be brought if Joe did not plead guilty. This was permissible under *Bordenkircher*. However, government counsel also told Joe Juarez' counsel that the package deal would be withdrawn if Joe Juarez proceeded with his motion to dismiss for outrageous government conduct during the investigation. The narrow question is whether the assistant U.S. attorney's statement, and the fact that a superseding indictment was returned, give rise to a presumption of vindictiveness. The overarching and much more troublesome question is whether the government, while engaging in plea discussions, can chill the defendants' conceded right to proceed with pre-trial motions.

The government argues that the additional charges were brought as a result of Joe Juarez' rejection of the package deal. The government also points out that the initial indictment was based on an investigation report that did not describe the gun sales to the convicted felon. The prosecutor acquired this additional information in a second investigation report received after the first indictment was returned. The government notes that additional charges based on newly discovered evidence do not give rise to a presumption of vindictiveness. *United States v. Bryant*, 770 F.2d 1283, 1287 (5th Cir.1985),

*cert. denied,* 475 U.S. 1030, 106 S.Ct. 1235, 89 L.Ed.2d 343 (1986).

■ Sitting en banc, this court has held that a superseding indictment supports a presumption of vindictiveness when the additional charges are based on the same conduct that was the subject of the first indictment, when the same sovereign was involved, and, most importantly, when the decision to file increased charges directly followed the assertion of a procedural right. *Adamson v. Ricketts,* 865 F.2d 1011, 1018 (9th Cir.1988) (en banc), *cert. denied,* 497 U.S. 1031, 110 S.Ct. 3287, 111 L.Ed.2d 795 (1990), *called into question on other grounds by Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) (*see Nichols v. McCormick,* 929 F.2d 507, 509 n. 3 (9th Cir.1991)). The presumption may be found more readily when the same conduct forms the basis for both indictments, but this is not essential to a showing of vindictiveness. *United States v. Robison,* 644 F.2d 1270, 1272–73 (9th Cir. 1981).

We have considered claims similar to Joe Juarez' argument in a number of cases. *United States v. DeMarco,* 550 F.2d 1224, 1226 (9th Cir.) (dismissing indictment when government brought additional charges because defendant obtained severance and change of venue), *cert. denied,* 434 U.S. 827, 98 S.Ct. 105, 54 L.Ed.2d 85 (1977); *United States v. Groves,* 571 F.2d 450, 453 (9th Cir. 1978) (dismissing indictment on marijuana charges when government did nothing for nine months after defendant's arrest, then sought indictment after defendant moved to dismiss related cocaine charge).

A critical fact in the present case is the prosecutor's threat to withdraw the package deal if Joe Juarez proceeded with his motion to dismiss for outrageous government conduct. The government then followed through on this threat. Joe Juarez has made "an initial showing that charges of increased severity were filed because the accused exercised a statutory, procedural, or constitutional right in circumstances that give rise to an appearance of vindictiveness." *Gallegos–Curiel,* 681 F.2d at 1168. The burden now shifts to the government to rebut the presumption.

■ We believe that under the facts presented here, the question is very close. We are very troubled with the representation that the U.S. Attorney's office did not originally receive from the investigating agents a report describing Joe Juarez' firearm sales to the convicted felon, even though the agents received their original report of possible illegal sales in February 1990 and the actual events took place variously on June 9, June 19, June 28, July 5 and August 4, 1990. The prosecution represents that the agents' first investigation report, which formed the basis of the original indictment, did not discuss the firearm sales. The original indictment described the discussion of suppressors on August 4; it was during this same meeting that Joe Juarez also sold four guns to the convicted felon.

Although we find the chronology of the prosecutor's receipt of these reports somewhat strange, given the chronology of the investigation itself—and perhaps so did the district court, as reflected by its decision to depart downwardly—there is no evidence requiring us to reject the prosecution's representation.

On the basis of the precise record before us, we must conclude that the government has presented sufficient evidence to rebut the presumption of vindictiveness. The prosecutor specifically warned Joe Juarez that a refusal to plead guilty could lead to additional charges. The government's decision to seek additional charges may have been based solely on the rejection of the plea bargain. Had Joe dropped his motion to dismiss and also rejected the plea bargain, the government still might have sought the additional charges under these terms. Thus, the additional charges were not linked exclusively to the motion to dismiss.

Moreover, the timing gives some support to the government's position. The deadline for the plea bargain was March 15. The defendants' motion to dismiss was denied on March 18. The superseding indictment was returned on April 24. Thus, we are not faced with a situation such as was presented in *Groves,* where there was no legitimate reason for the delay in seeking the challenged indictment. The government waited until Joe

Juarez rejected the plea bargain and then sought the superseding indictment.

The district court did not err in denying the motion to dismiss for vindictive prosecution.

## V.

■ Both Joe and Esteban Juarez contend that the government's conduct during the investigation amounted to entrapment as a matter of law and that the evidence was insufficient to show predisposition to commit the offenses. We conclude that the evidence supports a showing of predisposition, and therefore Joe and Esteban Juarez were not entrapped.

■ We recently reviewed the doctrine of entrapment in *United States v. Skarie*, 971 F.2d 317, 320 (9th Cir.1992):

Entrapment is designed to prevent the conviction of the "unwary innocent" induced by government action to commit a crime. It does not, however, protect the "unwary criminal." *United States v. Russell*, 411 U.S. 423, 429 [93 S.Ct. 1637, 1641–42, 36 L.Ed.2d 366] (1973). A defense of entrapment has two elements: government inducement of the crime and the absence of predisposition on the part of the defendant. To be entitled to acquittal as a matter of law on the basis of entrapment, [the defendant] must point to "undisputed evidence making it patently clear that an otherwise innocent person was induced to commit the illegal act" by government agents. *United States v. Hart*, 963 F.2d 1278, 1283 (9th Cir.1992) (quoting *United States v. Smith*, 802 F.2d 1119, 1124 (9th Cir.1986))....

"Where the Government has induced an individual to break the law and the defense of entrapment is at issue, ... the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." *Jacobson v. United States*, [— U.S. —, —] 112 S.Ct. 1535, 1540 [118 L.Ed.2d 174] (1992). Five factors are relevant in determining predisposition: (1) the character of the defendant, (2) who first suggested the criminal activity, (3) whether the defendant engaged in the activity for profit, (4) whether the defendant demonstrated reluctance, and (5) the nature of the government's inducement. *United States v. Citro*, 842 F.2d 1149, 1152 (9th Cir.1988). The defendant's reluctance is the most important factor. *United States v. Sotelo–Murillo*, 887 F.2d 176, 181 (9th Cir.1989). The Supreme Court has also stated that evidence of predisposition may arise both before the government's initial contact and during the course of dealings. *Jacobson*, — U.S. at —, 112 S.Ct. at 1541.

## A.

Applying the five factors to Joe Juarez, the first factor, the character of the defendant, favors him. He had no criminal record, and the government had no specific evidence that he was engaging in criminal conduct at the first contact.

The second factor in determining predisposition, who first suggested the criminal activity, also favors Joe Juarez. It is clear that he was the first to mention automatic weapons and suppressors, which were discussed at the initial meeting on June 9, 1990. However, Agent Murillo was the first to ask if Joe could supply these items, and he persisted even after Joe attempted to steer him towards legal methods of obtaining weapons and suppressors.

The third factor, whether the defendant engaged in the activity for profit, favors the government. Joe said he was out of a job and was selling guns to make money for himself and his family. He therefore hoped to profit from the activities.

As to Joe Juarez' reluctance, the record indicates that Agent Murillo initiated every meeting and telephone conversation. After Murillo asked about automatic weapons and suppressors on June 9, he contacted Joe again on June 19, June 28, July 5, July 18 and August 4 before Joe agreed to supply the materials to make an automatic weapon and suppressor. Another six contacts—on August 14, August 15, August 24, September 1, September 5, and September 12—were initiated by Murillo before the goods were delivered. The agent took the lead in all

these negotiations and deflected Joe Juarez' repeated suggestions that automatic weapons and suppressors be obtained through legal channels.

However, Joe Juarez showed no reticence in selling firearms to a convicted felon. On June 19, Murillo asked Joe if he would sell guns to a friend of Murillo's who had done time; the first sale was made on June 28.

On balance, it can be said that Joe Juarez displayed some, but not great, reluctance. This factor is thus inconclusive.

The final factor is the nature of the government inducement. The Court of Appeals for the Tenth Circuit has stated:

> "Inducement" may be defined as' government conduct which creates a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense.... Government inducement may take the form of "persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship." United States v. Burkley, 591 F.2d 903, 913 & n. 18 (D.C.Cir.1978), cert. denied, 440 U.S. 966 [99 S.Ct. 1516, 59 L.Ed.2d 782] (1979). Evidence that a government agent solicited, requested or approached the defendant to engage in criminal conduct, standing alone, is insufficient to constitute inducement.

United States v. Ortiz, 804 F.2d 1161, 1165 (10th Cir.1986); see also United States v. Citro, 842 F.2d 1149, 1151 (9th Cir.1988) (finding of entrapment as a matter of law requires undisputed evidence that government agent induced innocent person to commit crime by trickery, persuasion or fraud).

As previously stated, Murillo initiated every contact and took the lead in negotiating for the illegal weapons. On each occasion when Joe Juarez told Murillo about alternative means of obtaining automatic weapons and suppressors, Murillo either ignored this suggestion or said he lacked expertise or didn't want to be bothered. Murillo never used any threats or offered additional cash as an incentive. We are satisfied that the government conduct here did not rise to the level of inducement in the cases on which Joe Juarez relies. Murillo's suggestions and solicitations do not appear to constitute the sort of inducement that satisfies this element of the entrapment defense. Thus the fifth factor favors the government.

In summary, the first two factors favor Joe Juarez and the final three are either inconclusive or favor the government. The most important consideration, Joe's reluctance, is inconclusive. Based on this application of the test stated in Skarie, Joe Juarez has not presented undisputed evidence making it patently clear that an otherwise innocent person was induced to commit an illegal act. The district court did not err in denying Joe Juarez' motion for acquittal based on entrapment as a matter of law.

**B.**

█ Applying the five factors to Esteban Juarez, the first factor favors him. He had no prior record of criminal activity and was not observed doing anything illegal at the time of the first contact.

The second factor, who first suggested the criminal activity, also favors Esteban. As with Joe Juarez, Murillo did not first raise the subject of suppressors, but he did first ask about obtaining them from Esteban. Regarding automatic weapons, Murillo was the first to raise the subject and to suggest that Esteban supply them.

It is uncontested that Esteban Juarez intended to sell the items for a profit, so the third factor favors the government.

As to the fourth factor, Esteban Juarez showed no reluctance to supply automatic weapons and suppressors. When Murillo asked him about these items on August 4, he immediately responded with prices.

Finally, Murillo offered no particular inducement to Esteban, other than the price of the finished products. The fifth factor favors the government.

The evidence regarding Esteban Juarez supports a conclusion that he was predisposed to commit the offenses. The district court did not err in denying his motion for acquittal based on entrapment.

## VI.

■ Both Joe and Esteban Juarez contend that their convictions must be reversed, because the district court failed to include in the jury instructions a definition of "possession." Such an instruction was not requested, and this court therefore may reverse only if the omission amounted to plain error, that is, highly prejudicial error affecting substantial rights. *United States v. Hernandez,* 876 F.2d 774, 777 (9th Cir.1989).

Neither Joe Juarez nor Esteban Juarez contested possession at trial. The judge charged the jury that it must find each defendant "knowingly possessed a silencer." During deliberations, the jury requested a definition of possession but then reached a verdict before the court could respond.

The Juarezes rely principally on three cases in support of their contention that the failure to define "possession" was plain error. Each case, however, involves a putative failure to charge on a particular element of the offense. *United States v. Mal,* 942 F.2d 682, 685–86 (9th Cir.1991); *United States v. Kindred,* 931 F.2d 609, 612 (9th Cir.1991); *United States v. Terry,* 911 F.2d 272, 280 (9th Cir.1990). The district court charged the jury that it had to find possession; the putative error was not a failure to charge on a particular element of the offense, but a failure to define "possession."

■ A jury charge that does not include definitions of words of general use does not constitute plain error. *United States v. Watson,* 953 F.2d 406, 410 (8th Cir.1992) ("attempt"); *United States v. Chambers,* 918 F.2d 1455, 1460 (9th Cir.1990) ("knowingly"). The government argues that "possession" is a word of general use. The defendants' rejoinder is that the jury's evident uncertainty about its meaning belies that claim.

Were this a case in which possession had been contested, the defendants' argument might have more weight. Under the applicable standard of review, however, we conclude that no plain error occurred. Omitting a definition of possession cannot be said to be a highly prejudicial error affecting substantial rights.

## VII.

■ The district court departed downward from the guidelines range of 15–21 months imprisonment and sentenced Joe and Esteban Juarez to six months house arrest, sixty months probation and 100 hours of community service on each count, the sentences to run concurrently. In its notice of intent to grant a downward departure, the court stated that "the conduct of this investigation, although not amounting to entrapment, was sufficiently coercive in nature as to warrant a downward departure under Guideline 5K2.12." At sentencing, the court reiterated that the government's investigatory conduct was not unlawful or inappropriate and did not amount to entrapment. The court then proceeded to grant downward departures in both cases.

The district court must impose a sentence within the guidelines range—

> unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.

18 U.S.C. § 3553(b).

Our review is governed by 18 U.S.C. 3742(f), which provides that sentence must be affirmed unless it "(1) was imposed in violation of law or imposed as a result of an incorrect application of the sentencing guidelines ... [or] (2) is outside the applicable guideline range and is unreasonable or was imposed for an offense for which there is no applicable sentencing guideline and is plainly unreasonable." This standard is further described in section 5K2.0, p.s. of the guidelines:

> Any case may involve factors in addition to those identified [in subpart 2] that have not been given adequate consideration by the Commission. Presence of any such factor may warrant departure from the guidelines, under some circumstances, in the discretion of the sentencing court.

In *United States v. Lira–Barraza,* 941 F.2d 745, 746–47 (9th Cir.1991) (en banc), this court set out a three-part test for review of departures. The sentence will be affirmed

if: (1) the district court had authority to depart; (2) factual findings were not clearly erroneous; and (3) the extent of the departure was reasonable in light of the structure, standards and policies of the statute and guidelines.

We note at the outset that our role in reviewing the district courts' application of the sentencing guidelines is limited:

> Appellate courts have long followed the principle that sentences imposed by district courts within legal limits should not be disturbed. The sentencing provisions of [the Sentencing Reform Act] are designed to preserve the concept that the discretion of a sentencing judge has a proper place in sentencing and should not be displaced by the discretion of an appellate court. At the same time, they are intended to afford enough guidance and control of the exercise of that discretion to promote fairness and rationality, and to reduce unwarranted disparity, in sentencing. Section 3742 accommodates all of these considerations by making appellate review of sentences available equally to the defendant and the government, and by confining it to cases in which the sentences are illegal, are imposed as the result of an incorrect application of the sentencing guidelines, or are outside the range specified in the guidelines and unreasonable.

S.Rep. No. 225, 98th Cong., 2d Sess. 150, *reprinted in* 1984 U.S.S.C.A.N. 3182, 3333 (footnotes omitted).

■ In reviewing the sentences imposed by the district judge, we must give due regard to "the superiority of his [or her] nether position." Maurice Rosenberg, *Judicial Discretion of the Trial Court, Viewed From Above*, 22 Syracuse L.Rev. 635, 663 (1971). Promulgation of the sentencing guidelines has placed certain stated limitations on the sentencing court's exercise of discretion, but the guidelines have neither handcuffed the sentencing judge nor placed him or her in a strait-jacket. What was stated in the legislative history, as reflected in the Senate Report quoted above, deserves repetition for emphasis:

> [T]he discretion of a sentencing judge has a proper place in sentencing and should

not be displaced by the discretion of an appellate court.

We are satisfied that the sentencing court was sufficiently troubled by the defendants' arguments on entrapment, prosecutorial misconduct and vindictive prosecution to the extent that although not satisfied that the indictments should have been dismissed and a judgment NOV entered, it had the authority to reflect its concern in pronouncing sentence. The court stated in advance what it intended to do, and operating precisely within the sentencing guidelines, it relied on section 5K2.12, p.s. to support its action:

> If the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may decrease the sentence below the applicable guideline range. The extent of the decrease ordinarily should depend on the reasonableness of the defendant's actions and on the extent to which the conduct would have been less harmful under the circumstances as the defendant believed them to be. Ordinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party. . . .

U.S.S.G. § 5K2.12, p.s.

■ The government focuses its argument on the first part of the *Lira–Barraza* test, whether the court had authority to depart. It argues flatly that "some sort of physical harm is necessary to warrant a downward departure" under section 5K2.12. Govt. Br. at 49. We disagree.

First, the ordinary meanings of "coercion" and "duress" support the district court's action. To coerce is to nullify individual will, and this can be accomplished through intimidation as well as by force, power and violence. *See Webster's Third New International Dictionary (Unabridged)* 439 (1968) ("Religion has in the past tried to coerce the irreligious, by garish promises and terrifying threats.") (quoting W.R. Inge). The classic legal precedent describing psychological coercion is *Miranda v. Arizona*, 384 U.S. 436, 448–55, 86 S.Ct. 1602, 1614–17, 16

L.Ed.2d 694 (1966). Duress is ·defined by Webster as "stringent compulsion by threat of danger, hardship or retribution." *Webster's* at 703.

The government would have us read out or ignore totally the limiting word "ordinarily" in the policy statement: "Ordinarily, coercion will be considered sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury...." We refuse to commit the material fallacy of vicious abstraction. *See Borough of Lansdale v. Philadelphia Elec. Co.*, 692 F.2d 307, 311–312 (3d Cir.1982); *Allegheny Gen. Hosp. v. NLRB* 608 F.2d 965, 967–68 (3d Cir.1979). Thus, under ordinary circumstances, proof of injury or damage may be required. But the district court did not find these circumstances to be ordinary. And neither do we.

■ Our sister circuits have recognized that section 5K2.12 was meant to apply precisely to those situations where a complete defense was not present. *United States v. Amparo*, 961 F.2d 288, 292 (1st Cir.) (jury's rejection of duress defense does not preclude downward departure under section 5K2.12), *cert. denied sub nom. Sanchez v. United States*, — U.S. —, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992); *United States v. Cheape*, 889 F.2d 477, 480 (3d Cir.1989) (vacating sentence when district court ruled that jury's rejection of coercion defense precluded downward departure under section 5K2.12); *United States v. Whitetail*, 956 F.2d 857, 863 (8th Cir.1992) (vacating sentence when district court ruled that jury's rejection of battered-woman defense precluded application of section 5K2.12); *see also United States v. Giles*, 768 F.Supp. 101, 103 (S.D.N.Y.) (granting downward departure based on "the manner in which [defendant] was set up for this crime by the Government's agent," even though jury rejected entrapment defense), *aff'd*, 953 F.2d 636 (2d Cir.1991) (table), *cert.*

*denied*, — U.S. —, 112 S.Ct. 1509, 117 L.Ed.2d 647 (1992); *United States v. Nelson*, 740 F.Supp. 1502, 1516 (D.Kan.1990) (granting ·downward departure under section 5K2.12 based on coercion even though jury rejected coercion defense; citing *Cheape* ).

We have previously recognized that a downward departure may be appropriate when government agents used persuasion alone, not threats. In *United States v. Takai*, 941 F.2d 738 (9th Cir.1991), the defendant participated in a scheme to bribe a government official. The district court granted a downward departure in part because—

[t]he seriousness of defendants' participation is mitigated by the conduct of the government agent. While there was no allegation of entrapment, there was evidence at the sentencing hearing that Agent Goldman's conduct influenced defendants' decisions to continue playing a pivotal role.

*Id.* at 741. We affirmed the sentence, even though the agent's conduct "did not constitute entrapment in a legal sense." *Id.* at 744.

The district court in the present case was faced with a similar situation. Agent Murillo did not threaten the defendants, but it was he who initially proposed the illegal activity and persistently contacted Joe Juarez by telephone and in person over several months until the scheme was completed. This sort of aggressive encouragement of wrongdoing, although not amounting to a complete.defense, may be used as a basis for departure under section 5K2.12.

·A contrary result is not mandated by *United States v. Dickey*, 924 F.2d 836 (9th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 383, 116 L.Ed.2d 334 (1991). In that case, we held that a downward departure based on "imperfect entrapment" was not appropriate, "at least where a defendant pleads guilty to an offense." 924 F.2d at 839.[1] The Juarez

---

1. Judge Reinhardt, dissenting in part, wrote, "I take it then that the majority believes that as a matter of law the defense·of imperfect entrapment is simply not the type of mitigating factor that could ever justify a downward departure." *Id.* at 840. However, the panel opinion leaves open the possibility of downward departure when the defendant did not plead guilty. In

such circumstances, the rationale advanced by Judge Reinhardt would apply:

·It seems evident that reluctance or lack of predisposition that for one reason or another does not amount to a complete entrapment defense could under some circumstances justify a shorter sentence than would be appropriate for a more willing and enthusiastic partici-

brothers here contested their guilt at trial and challenge their convictions on appeal.

We conclude that the district court had authority to depart under section 5K2.12 and that the downward departures were appropriate under 18 U.S.C. § 3742(f) and under the test articulated in *Lira–Barraza*.[2]

## VIII.

■■■ The court based its downward departure in part on Joe Juarez' mental condition, panic disorder with agoraphobia. The government argues that this was error.

Guideline section 5H1.3, p.s. provides:

Mental and emotional conditions are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range, except as provided in Chapter Five, Part K, Subpart 2.

Applying the three-part test of *Lira–Barraza*, we conclude first that the district court had authority to grant a downward departure based on sections 5H1.3 and 5K2.0.[3] The language in section 5H1.3, "Mental and emotional conditions are not *ordinarily* relevant," (emphasis supplied) indicates that the commission intended these factors to play a part in some cases, albeit a limited number.

The second prong is the factual basis of the district court's decision to depart. The court's sole findings of fact on this issue were taken directly from the notice of intent to depart: "The defendant suffers from a medical condition, panic disorder with agoraphobia, which is a mitigating factor of a kind not

adequately taken into consideration by the sentencing commission in formulating its guidelines." C.R. 98, at 1 (Memorandum of Sentencing Hearing and Report of Statements of Reasons).

More detailed findings would have assisted this court in determining whether Joe Juarez' mental disorder was extraordinary or existed to a degree not adequately considered by the sentencing commission. However, the record contains evidence that the disorder first appeared in 1972 "and has developed into a serious problem, totally debilitating [Joe] at times." Joe Juarez Reply Br. at 27 (quoting letter from Behavioral Health Agency of Central Arizona, included in Presentence Investigation Report). The government does not challenge the court's factual finding that Joe Juarez suffers from the disorder, and indeed seems to acknowledge its seriousness: "[The disorder] caused the defendant to suffer panic attacks when in airplanes, driving in large cities, and in unfamiliar areas," with symptoms "similar to those of a heart attack." Govt. Br. at 52. Based on this evidence, we cannot conclude that the district court's findings as to the severity of Joe Juarez' disorder were clearly erroneous.

■■■ Finally, the extent of the departure (four levels), when considered in conjunction with the other rationales heretofore discussed in Part VII, was not unreasonable.

We conclude that the sentences imposed were consistent with 18 U.S.C. § 3742(f) and

pant in the same crime. This would be the case whether one views incarceration as serving a primarily retributive or incapacitative purpose. [citation omitted]. A reluctant criminal is one who is both less morally blameworthy than an enthusiastic one and less likely to commit other crimes if not incarcerated. *Id.*

2. The government briefly states that the second and third factors of the *Lira–Barraza* test also require a reversal: The factual findings were clearly erroneous, and the extent of the departure was unreasonable. Govt. Reply Br. at 5–6. The government states that there is no factual support for a departure absent compulsion or a show of force. This contention has been discussed above; threats of violence are not a prerequisite to application of the guideline in cases of "imperfect entrapment." The government

also asserts that the departure was unreasonable but makes no attempt to show that similarly situated defendants were given much different sentences. The sentence imposed would be appropriate for a defendant with a base offense level of 10, criminal history category of I. R.T., March 3, 1992, at 20, 28; U.S.S.G. § 5B1.1(a)(2) (sentence of probation authorized if minimum term of imprisonment under sentencing table is not more than six months). The sentence thus represents a decrease of four levels. R.T. at 21, 28. We do not conclude that this was unreasonable under the circumstances.

3. The parties also address the appropriateness of a downward departure based on diminished capacity. Govt. Br. at 53; Joe Juarez Reply Br. at 26–27. However, the district court did not base its departure on section 5K2.13, p.s., which concerns diminished capacity.

the teachings of *Lira–Barraza.*[4]

### IX.

We have considered the contentions of the parties. The judgment of the district court is **AFFIRMED.**

---

**4.** The government also argues that the sentences were not supported by reasons based on the foundation, structure and policies of the sentencing guidelines. The government contends that the sentences were arbitrary, because the district court determined the extent of the departure after pronouncing sentence, rather than before, and because the court did not follow "some reasonable, articulated methodology." ' Govt. Br. at 56 (quoting *United States v. Streit,* 962 F.2d 894, 906 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 431, 121 L.Ed.2d 352 (1992)). This contention is without merit. As discussed in this and the preceding sections, the court indicated "the specific reason for the imposition of a sentence different from that described [in the sentencing table]." 18 U.S.C. § 3553(c)(2).