COMMONWEALTH *vs.* JOHN J. PELOQUIN.

Plymouth. April 2, 2002. - June 21, 2002.

Present (Sitting at Barnstable): MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Self-Defense. Practice, Criminal,* Instructions to jury, Assistance of counsel. *Constitutional Law,* Assistance of counsel.

There was no substantial risk that the jury's verdict in a murder case was unfairly influenced by the lack of an instruction to the jury on the so-called "castle" law, G. L. c. 278, § 8A, and, consequently, on the record presented, it could not be said that the defendant's trial counsel was constitutionally ineffective for failing to request the castle law instruction. [207-212]

INDICTMENT found and returned in the Superior Court Department on May 19, 1987.

Following review in the Appeals Court, 30 Mass. App. Ct. 960 (1991), a motion for a new trial, filed on December 23, 1993, was heard by *Patrick F. Brady,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Gail M. McKenna,* Assistant District Attorney, for the Commonwealth.

*Deirdre Lee Thurber* for the defendant.

GREANEY, J. In 1988, a jury in the Superior Court convicted the defendant of murder in the second degree (on an indictment charging murder in the first degree). The defendant's conviction was affirmed on direct appeal. *Commonwealth* v. *Peloquin,* 30 Mass. App. Ct. 960 (1991). In 1993, the defendant filed a pro se motion for a new trial. Counsel was appointed to represent him. The motion asserted that the defendant's trial counsel had provided him with ineffective representation by failing to request a jury instruction on the so-called "castle" law, G. L. c. 278, § 8A. The defendant also contended that the failure to raise the

issue on direct appeal did not constitute a waiver because his trial counsel also served as appellate counsel. A judge in the Superior Court denied the motion without a hearing.[1] The Appeals Court reversed the denial of the motion for a new trial, *Commonwealth* v. *Peloquin*, 52 Mass. App. Ct. 480 (2001), concluding that the defendant's trial counsel had been ineffective. We granted the Commonwealth's application for further appellate review and now affirm the order denying the defendant's motion for a new trial.

1. The Commonwealth presented evidence tending to show the following. On the morning of February 20, 1987, two intruders entered the defendant's apartment in Brockton and ordered the defendant and two other men, John Landolfi and Pete Watson, to lie on the floor at gunpoint. One of the intruders grabbed two children[2] who also were present in the apartment and held one child under each arm. The three men on the floor were told not to move or they would be shot. The intruders robbed the defendant of over $2,000 and a gold chain. After the assailants left, no one telephoned the police to report the robbery. Instead, the defendant enlisted the aid of his younger brother, Craig M. Faria, to seek out the assailants and recover the stolen money.

After drinking together for a short time, the defendant, Faria, and Landolfi drove around Brockton in search of a person whom the defendant believed to have been one of the assailants (Ernie Harris). The defendant and Faria were both armed with handguns. On seeing Harris, the defendant and Faria approached him, but Harris eluded them and fled down the street. Their attempt to recover the stolen money unsuccessful, the defendant, Faria, and Landolfi returned to the defendant's apartment and resumed drinking.

The defendant was angry with Faria and a heated argument developed between the two men. The defendant accused Faria of allowing Harris to escape and told him that "[he] should have shot [Harris]." Faria responded, "You think you're tough [but] without guns you're nothing." The defendant called Faria a "puke" and a "low life." At one point during the afternoon,

---

[1] The trial judge had retired.

[2] The children were the daughters of the defendant's girl friend.

the defendant took possession of Faria's gun. Several times, the defendant told Faria to leave his apartment.

Just after 5 P.M., Faria offered to go find Harris. He put on his coat and was preparing to leave, but the defendant told him to "forget it." Faria sat back down in a large wicker chair with a "fan back." The defendant sat directly across from him, approximately ten feet away. The defendant began waving his gun around and telling Faria that he should have shot Harris. Faria, who did not have a gun at that point, told the defendant, "Put the gun away or I'll stick it up your ass." Faria also told the defendant that he would "rip his face off." The defendant said to Faria, "I'll shoot you. I'll shoot you. You don't think I'll shoot you?," and that he was "going to do Brockton a favor." The defendant pulled out the larger of the two guns, and, crouching on one knee, he fired two or three times at Faria. The defendant then walked out of the back door of the apartment.

Faria died at a hospital shortly thereafter from two gunshot wounds to the abdomen. The pathologist who performed the autopsy testified that the bullets first grazed Faria's hands, which, the Commonwealth argued, indicated that Faria had held both hands in front of his stomach in a defensive posture at the time that he was shot.

The defendant's evidence portrayed a much different picture of the events. The defendant testified in his own behalf and admitted that he was angry with Faria for failing to recover the money that had been taken from him. On returning to his apartment, the men began drinking heavily and the discussion grew increasingly heated. Reminding Faria, "There's kids in my house" and "[he did not] want no guns around here," the defendant asked Faria for his gun and then placed both his gun and Faria's gun within a hidden space above "an artificial ceiling" in the kitchen. As the afternoon wore on, Faria become offensive and violent toward the defendant. Faria called the defendant a "punk" and threatened to "kick [his] ass." The defendant asked Faria to leave at least ten times.

According to the defendant, at approximately 6 P.M., Faria took both guns out of the ceiling and handed the defendant back his gun. Faria stated, "Come on. I'll go get [Harris] for you now," to which the defendant responded, "No, you already

made matters worse than they are." The defendant added, "You're not getting me killed. If you want to go get yourself killed, go, they'd be doing Brockton a favor." At this point, Faria, who was standing by the entrance to the apartment, punched the wooden door frame in anger, saying, "I'll shoot you. I'll shoot you. You don't think I'll fuck[ing] shoot you."

The defendant then backed off to the other side of the room. Faria sat down in the wicker chair. The defendant once again asked Faria to "please leave. You don't even care about the kids or nothing." At this, Faria got very angry and said, "Fuck the kids. They're not your fucking kids anyways." According to the defendant, Faria then "reached down and grabbed the gun out of his waist." Believing that Faria was going to shoot him, the defendant dived out of the chair that he had been sitting in and fired the gun twice at Faria. The defendant testified that the shooting was "just a reaction. . . . [T]his guy's going to shoot me . . . and it was just a reaction."

2. We turn now to the merits of the appeal. General Laws c. 278, § 8A, inserted by St. 1981, c. 696, reads as follows:

> "In the prosecution of a person who is an occupant of a dwelling charged with killing or injuring one who was unlawfully in said dwelling, it shall be a defense that the occupant was in his dwelling at the time of the offense and that he acted in the reasonable belief that the person unlawfully in said dwelling was about to inflict great bodily injury or death upon said occupant or upon another person lawfully in said dwelling, and that said occupant used reasonable means to defend himself or such other person lawfully in said dwelling. There shall be no duty on said occupant to retreat from such person unlawfully in said dwelling."

At common law, "the right to use deadly force by way of self-defense [was] not available to one threatened until he [had] availed himself of all reasonable and proper means" to avoid combat before resorting to the use of deadly force. *Commonwealth* v. *Shaffer*, 367 Mass. 508, 511 (1975) (declining to adopt majority rule that one assaulted in own home need not retreat before resorting to use of deadly force). See *Com-*

*monwealth* v. *Reed*, 427 Mass. 100, 102 (1998); *Commonwealth* v. *Epsom*, 399 Mass. 254, 258 (1987); *Commonwealth* v. *Harrington*, 379 Mass. 446, 450 (1980). The enactment of G. L. c. 278, § 8A, modified the common law by justifying the use of deadly force by a person in his own home to respond to an assault threatening death or great bodily harm by someone unlawfully in the home, even though the person had a reasonable means of retreat or escape. See *Commonwealth* v. *Noble*, 429 Mass. 44, 49 (1999); *Commonwealth* v. *Cyr*, 425 Mass. 89, 98 (1997), *S.C.*, 433 Mass. 617 (2001); *Commonwealth* v. *Dunn*, 43 Mass. App. Ct. 58, 64 (1997); *Commonwealth* v. *Gregory*, 17 Mass. App. Ct. 651, 652-653 (1984). It is generally for the jury to determine whether the victim in a particular case was, in fact, unlawfully present in a dwelling, and the judge may instruct on the law of trespass to assist the jury in this determination. See *Commonwealth* v. *Noble, supra.*

Nothing in G. L. c. 278, § 8A, however, eliminates the duty on the part of the occupant of the dwelling to retreat from a confrontation with a person who is lawfully on the premises. See *Commonwealth* v. *Lapointe*, 402 Mass. 321, 329 (1988). The statute is not applicable, therefore, in circumstances where one is threatened or assaulted in one's home by another who is an invited guest, and thus lawfully on the premises, even when that guest launches a life-threatening assault on the defendant. See *Commonwealth* v. *Painten*, 429 Mass. 536, 545-546 (1999) (castle law did not apply, even where victim [guest] threatened defendant with knife); *Commonwealth* v. *Lapointe, supra* (castle law did not apply where defendant had opened door to permit assailant to enter).

The obvious purpose of the statute is to allow an occupant to defend against unlawful intruders and not to permit the use of deadly force against social guests whenever a verbal altercation threatens to escalate into a physical confrontation.[3] On the other hand, the plain language of the statute includes someone who is

---

[3]The no retreat, or castle law, doctrine as applied in other jurisdictions may have broader implications. As stated in one treatise, "[a] defendant need not retreat if he is attacked in his 'castle' (dwelling house), even if he can do so with reasonable safety. This is true even if the attacker is the defendant's spouse or guest or person with whom he shares the living quarters, as distinguished from a mere intruder." 2 C. Torcia, Wharton's Criminal Law

"unlawfully in said dwelling," and it is a familiar principle that a person who enters a dwelling lawfully, but refuses to leave when ordered to do so, becomes a trespasser. See G. L. c. 266, § 120.

The exact boundaries of G. L. c. 278, § 8A, need not be resolved in this case. The contested issue at trial was whether the Commonwealth had proved, beyond a reasonable doubt, that the defendant did not act in self-defense when he used deadly force in shooting Faria. The defendant correctly points out, that, in explaining the law of self-defense to the jury, the judge instructed in the usual manner in language that failed to express the no retreat concept embodied in G. L. c. 278, § 8A. It is possible that a castle law instruction, had one been requested by the defendant's trial counsel, should have been given to the jury, along with instructions regarding the manner for determining whether a person is "unlawfully in [the] dwelling." The dispositive question on appeal, however, is whether, on this record, it can be said that the defendant's trial counsel was constitutionally ineffective for failing to request a castle law instruction. We examine the question under our traditional two-prong test stated in *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974): "whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." See *Commonwealth* v. *Egardo*, 426 Mass. 48, 52 (1997). With respect to the second requirement, this court has stated that "there ought to be some show-

---

§ 128, at 194-195 (15th ed. 1994). See 1 W.R. LaFave & A.W. Scott, Jr., Substantive Criminal Law § 5.7, at 660 (1986) (defender generally "need not retreat from his home or place of business, except perhaps when the defender was the original aggressor or the assailant is a co-occupant of those premises"); Model Penal Code and Commentaries § 3.04(2)(b)(i)(A) (1985) ("the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be"). The statutes and cases from other jurisdictions on the castle law are so variegated that they render no help to the analysis of our statute, which is expressly limited to cases of an occupant's self-defense against someone "unlawfully in said dwelling." G. L. c. 278, § 8A.

ing that better work might have accomplished something material for the defense." *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977).[4] Further, strategic or tactical judgments of counsel will not be second guessed unless the judgment is shown to be "manifestly unreasonable." *Commonwealth* v. *Adams*, 374 Mass. 722, 728 (1978). The burden is on the defendant to meet both prongs of the test.

The defendant has failed to meet his burden on both parts of the test. The trial presented the jury with a stark contrast between the Commonwealth's and the defendant's accounts of the confrontation. In the cool calculation of wishful thinking, the defendant attempts to fasten labels of incompetence and strategic failure on his trial counsel that simply do not fairly apply. See *Commonwealth* v. *Johnson*, 374 Mass. 453, 465 (1978) ("We look askance when counsel who has tried a case, without success, before a judge and jury on one theory of law, then attempts to obtain appellate review on an entirely different theory which was never advanced or suggested at the trial and which is not based on any objection . . . . Our view is the same notwithstanding the fact that the defendant is being represented on these appeals by counsel other than the one who represented him at the original trial"). From all that appears in the record,[5] the defendant's trial counsel purposely pursued the reasonable strategy of using the defendant's own testimony and his other evidence, and arguing to the jury the strongest defense available, namely, that the defendant had acted properly to defend himself against Faria's imminent attack by deadly force. The conclusion that this was the operative strategy is reinforced

---

[4] We have recognized that this standard for testing the ineffectiveness of counsel is not significantly different from our standard of a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Peters*, 429 Mass. 22, 31 n.12 (1999); *Commonwealth* v. *Curtis*, 417 Mass. 619, 624-625 n.4 (1994) ("if an omission of counsel does not present a substantial risk of a miscarriage of justice . . . there is no basis for an ineffective assistance of counsel claim under either the Federal or the State Constitution"). The test in *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974), and the substantial risk of a miscarriage of justice test are, substantively, two sides of the same coin.

[5] We keep in mind that an ineffective assistance of counsel challenge made on the trial record alone is the weakest form of such a challenge because it is bereft of any explanation by trial counsel for his actions and suggestive of strategy contrived by a defendant viewing the case with hindsight.

by the defendant's affidavit in support of his motion for a new trial[6] and the lack of any affidavit from his trial counsel suggesting that he may have erred by not requesting an instruction under the statute.[7] Retreat was simply not a viable issue at the trial.

While not strictly necessary to our decision, we think it worth noting that, on the instructions given by the judge, the defendant suffered no disadvantage. The judge instructed the jury that "the defendant must have done everything that was reasonable in the circumstances to avoid physical combat before resorting to force," and that the defendant was permitted to use physical force "only if he could not get out of the situation in some other way that was available and reasonable at the time." The judge notably also told the jury:

> "Where the [incident] took place may be particularly important. In some situations a person might have a clear field and be able to escape by walking away or otherwise getting to safety or by summoning help if that could be done in time or by holding the attacker at bay if the means were available or by some other method. In other cases such escape routes may not be available. The issue is whether the defendant's use of force reasonably seemed to be the only way to protect himself in the circumstances. In

---

[6]The defendant's affidavit stated the following:

"17. At some point around 5:45 P.M., [the victim] again threatened to rip my face off. [The victim] then started to rise from his chair in my direction. While he was starting to stand up, I saw his hand reaching for the gun that he had tucked into the waist of his pants.

"18. I jumped from the chair that I was sitting in and landed on my knees. While I was diving for the floor, I also pulled my gun out. When I saw that [the victim]'s hand was on his gun, and that he was pulling it out of his belt, I fired two shots at him."

[7]The defendant's trial counsel may have reasoned that a castle law instruction would have focused the jury's attention on the defendant's behavior, including the evidence that the defendant was the original aggressor in the verbal altercation that led to Faria's death, and the defendant's own testimony that he told Faria *not* to leave the apartment. In view of the unlikelihood of a jury's finding that Faria, the defendant's brother and a frequent guest in his home, was unlawfully present in the apartment, it is entirely possible that the failure of the defendant's trial counsel to request a castle law instruction was a tactical decision to avoid the jury's finding deliberate premeditation, which would have convicted the defendant of murder in the first degree.

considering this you are permitted to take into account that a person who is attacked may have to decide what to do quickly and under emotional strain."

These instructions, taken as a whole, explained that a defendant need not retreat unless he can do so in safety, and need not do so when he would increase the danger to his own life. Viewing the evidence in the light most favorable to the defendant, and accepting the defendant's testimony as true, there was virtually no likelihood that a reasonable juror would have thought that the defendant, sitting a mere ten feet away when Faria drew his gun, had any opportunity to retreat. As the judge clearly instructed, the duty to retreat does not impose the duty to put oneself in danger. See *Commonwealth* v. *Pike*, 428 Mass. 393, 398 (1998), and cases cited. Moreover, it is apparent that the defendant, by his own account, did his best to avoid a physical confrontation with Faria, a man known to the defendant as exceptionally prone to violence. The defendant testified that he "backed off" and asked Faria to "please leave." No reasonable juror believing the defendant's testimony would not have credited him with a genuine attempt to defuse the tension of the moment, in essence, to retreat. There is thus no substantial risk that the jury's verdict was unfairly influenced by the lack of the instruction.[8] We conclude, therefore, on the entire case, that the defendant has not demonstrated that counsel's representation at trial constituted a constitutional violation that requires a new trial in order to prevent an injustice.

3. The order denying the defendant's motion for a new trial is affirmed.

*So ordered.*

---

[8]The defendant may have benefited by the judge's failure to instruct the jury clearly that one who is culpable in bringing on the attack that necessitated his use of lethal force is not authorized to kill in self-defense at all. The Commonwealth portrayed the defendant as the initial aggressor in this quickly escalating situation.